**In re GUTERL SPECIAL STEEL CORP., Debtor.**

**EQUIMARK COMMERCIAL FINANCE COMPANY, Movant,**

v.

**Stanley .MAKOROFF, Trustee and Guterl Special Steel Corp., Respondents.**

**Bankruptcy No. 82–2590. Motion No. 88–2919.**

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 11, 1988.

William H. Schorling, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Equibank.

Stanley G. Makoroff, Trustee, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., for trustee.

Stephen I. Goldring, Pittsburgh, Pa., Asst. U.S. trustee.

MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Equibank's *Motion to Modify Stay and For Supplemental*

*Relief* to allow enforcement of its security interest in the overpayment of Guterl's pension plan.[1] The Trustee contends that Equibank's security interest does not extend to this fund, challenging Equibank's assertion that it is secured in "choses in action" or "general intangibles." The Trustee further asserts that the term "choses in action", as used in the original security agreements, relates only to accounts, and does not encompass the general, broad definition.

A hearing was held and the parties have submitted briefs on the issue. Based upon same, and this Court's further review, we find that Equibank was not secured in the overpayment until the Court, based upon the request of all the interested parties, extended the scope of the secured collateral on May 16, 1983.[2] From said date Equibank held a perfected security interest in "general intangibles", as opposed to "choses in actions" relating directly to "accounts".

## FACTS

This case commenced as a voluntary Chapter 11 reorganization on August 4, 1982. Equimark Commercial Finance Co. ("ECFC") as predecessor in interest to Equibank, had entered into several prepetition security agreements with Guterl, to provide working capital for its specialty steel operations. The first agreements, dated May 16, 1978 were titled "Accounts Receivable Agreement" and "Inventory Loan Agreement". The Accounts Receivable Agreement stated in pertinent part:

> FIRST, As collateral security for all present and future obligations of Customer to Corporation, Customer will and does hereby assign and pledge to Corporation, and gives Corporation a security interest in, all of its *Accounts* (*meaning* open accounts receivable, book debts, notes, acceptances, drafts, contracts, *contract rights* and *choses in action*),
>
> which it now owns or shall hereafter acquire or create immediately upon the acquisition or creation thereof, and the same immediately shall become subject to all of the terms and conditions hereof. On receipt of the daily assignments of Accounts, Corporation will credit Customer with an amount up to *Eighty–Five* Per Cent (*85%*) of the collateral value thereof, as determined by Corporation, and also will credit Customer with the remainder of the face amount of assigned Accounts on payment thereof to Corporation, less deductions and plus overpayments by debtors (meaning parties liable on Accounts). Corporation will loan Customer on request such amounts so credited or a part thereof as requested. No advances or loans need be made by Corporation hereunder if the financial condition of Customer becomes unsatisfactory to Corporation or as long as Customer be in default in the performance of any of its obligations to Corporation.

(emphasis added).

A second group of security agreements was executed on March 5, 1982. At this time ECFC was assisting Guterl in obtaining additional financing from Marine Midland Bank ("Marine") and Southern Investors Management Co. ("Simco"). In return for funds advanced to Guterl, Marine and Simco obtained first lien positions of equal priority on Guterl's machinery and equipment. As part of an intercreditor agreement ECFC received second position security on equipment and machinery, and Marine and Simco received equal second lien positions, behind ECFC, on all accounts receivable and inventory. All necessary and appropriate UCC filings were executed by the Debtor and were properly filed.

Almost immediately after the filing of the bankruptcy petition, which occurred on August 4, 1982, Guterl requested a Court Order permitting it to obtain postpetition financing. By Court Order dated August

---

1. This constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

2. Judge Gibson, then a Bankruptcy Judge for the Western District of Pennsylvania, signed the Order on May 13, 1983. During this period of jurisdictional turmoil, all such Orders were also signed by U.S. District Court judges. Judge Diamond, a District Court judge for the Western District of Pennsylvania, signed the Order on May 16, 1983.

12, 1982, ECFC was authorized to provide $205,000.00 in interim financing to Guterl.

Thereafter a hearing was held on August 24, 1982 to determine the extent to which postpetition financing would be necessary. The resultant security agreements provided ECFC with postpetition protection which essentially mirrored the prepetition agreements, to-wit: ECFC would hold a first lien position in Accounts Receivable and Inventory, a second lien position, behind Marine and Simco, on machinery and equipment, and a second mortgage on all of Guterl's realty.[3] The agreement organized the manner in which Guterl's receivables were to be collected and segregated, i.e., by their nature as prepetition or postpetition receipts. Separate books of account were used to monitor said collections. Prepetition receipts were used to pay the prepetition debt and postpetition receipts were used to pay the postpetition debt.

The prepetition and interim loans were paid in full early in 1983. Thereafter, however, Guterl's accounts and inventory began to fall below the level necessary to support further advances. This constituted a "default" under the terms of the security agreement, and pursuant to same ECFC refused to advance additional working capital. At that time Guterl owed ECFC a principal amount approximating $5.2 million.

Guterl needed $275,000.00 to complete work in process. It also faced a threatened strike by its employees who were confronted with the loss of medical benefits, since Guterl owed Blue Cross/Blue Shield approximately $320,000.00. Through an additional intercreditor agreement with ECFC, Marine and Simco, and the Bankruptcy Court's entry of an Order authorizing same, Guterl was able to secure the funds necessary to complete the work and pay the insurance carrier. This Supplemental Court Order, dated May 16, 1983, and bearing the written consent of all interested parties, including the Debtor-in-Possession, stated that ECFC possessed, as a result of the August 24, 1982 Order, a security interest in all accounts, *general intangibles*, and inventory. Paragraph six of said Order provided that the automatic stay was lifted as to all collateral subject to ECFC's security interest, "... including but not limited to all of Guterl's Accounts, contract rights, general intangibles, inventory including raw materials, work in process and finished goods ...".

On May 30, 1984 a Chapter 11 Trustee was appointed by the late Judge Gibson, our predecessor.[4] At some point thereafter the Trustee terminated Guterl's pension plan and received $70,759.10 in overfunding of same. On March 17, 1987, the Trustee was directed to pay the funds into Court, which then totaled $73,140.61, including accrued interest.

As of June 2, 1988 Equibank was owed the principal sum of $1,179,213.89 and interest in excess of $740,000.00.

## ANALYSIS

Equibank raises three arguments relating to its alleged security interest in general intangibles, all of which are challenged by the Trustee. Thereafter, the parties apparently agree, and this Court concurs, that if in fact Equibank is secured in general intangibles and/or choses in action as those terms of art are *commonly* used, as opposed to general intangibles and/or choses in action *only* as they relate to "accounts", then it is secured in the pension plan refund. We will address each argument individually.

■ Initially Equibank argues that each of the separate items listed within the pa-

---

3. The second mortgage was new collateral, offered by Guterl to provide ECFC with the impetus to supply postpetition financing.

4. For reasons unclear to this Court, and apparently in violation of the Bankruptcy Code, the individual appointed as Trustee was and is a partner in the law firm which represented Guterl as debtor-in-possession. Additionally, at that time, the Trustee's firm, Guterl's counsel, was appointed counsel to the Trustee. While we are unable to discern the rationale for such an appointment, we note for the record that same appears to bear the "hint of impropriety", and therefore the Trustee and his counsel will be closely monitored to thwart any possible conflict of interest.

rentheses, after the term "Account", in the Accounts Receivable Security Agreement, is a separate and distinct type of collateral, having no specific connection with "Accounts Receivable", except as to the type of financing said collateral secured.

Guterl contends that the security agreement must be read as stating that all of the collateral types within the parentheses relate to and/or modify the term "accounts", meaning accounts receivable. Guterl insists that a full reading of the Agreement shows that this interpretation is the more appropriate. We agree.

The agreement is specifically designated an "Accounts Receivable" Security Agreement. The parties understood the transaction to involve loans based upon eighty-five percent (85%) of Guterl's accounts receivable, and their practice supports same. The items contained in the parenthetical list after "Account" are preceded by the word "meaning" indicating that said items are terms of explanation relating to accounts receivable. That is the clear reading and understanding of the entire document.

■ Equibank has further argued that the subsequently signed and filed financing statements, which identify the collateral as accounts receivable, inventory, and general intangibles, merge with the security agreement, giving ECFC a perfected interest in Guterl's general intangibles. Guterl challenges this position, and asserts that the financing statement cannot control the collateral described in the security agreement.

The notice function of the financing statement is explained in the Official Comments to 12A P.S. (Purdon's) § 9–402, as follows: [5]

> ... what is to be filed is ... only a simple notice which may be filed before a security interest or thereafter ... indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry ... will be necessary to disclose the complete state of affairs ...

See also, In re King–Porter Co., 446 F.2d 722 (5th Cir.1971); In re Penn Housing Corp., 13 U.C.C. Rep.Serv. 947 (W.D.Pa. 1973); In re Stofko, 17 B.R. 115 (Bankr.W. D.Pa.1981). This section of the Uniform Commercial Code was designed specifically to keep the wheels of commerce rotating, by placing information publicly, to alert interested parties as to secured interests in property. See In re Certified Packaging Inc., 8 U.C.C.Rep.Serv. 95 (D.Utah 1970). While the collateral types listed in a financing statement may restrict the security interest created, by failing to offer full notice to a searching creditor, said classifications cannot have the effect of enlarging the security interest. Mitchell v. Shepherd Mall State Bank, 324 F.Supp. 1029 (W.D.Okla.1971), aff'd 458 F.2d 700 (10th Cir.1972); In re Platt, 3 U.C.C. Rep.Serv. 275 (E.D.Pa.1966); In re Marta Cooperative, Inc., 12 U.C.C.Rep.Serv. 955 (Nassau Cty.1973).

■ Equibank's final argument is valid and convincing. Equibank asserts that the Supplemental Court Order, dated May 16, 1983, provided ECFC with a security interest in general intangibles, and that the previously filed financing statements perfected same. The Trustee argues that said Court Order granted only a continuation of the previous security agreements and the security obtained under the Order of August 24, 1982.

A complete reading of this Supplemental Order makes it clear that the Trustee's contention is incorrect. The Order was not merely a recodification of previous agreements. As acknowledged in the numerous "Whereas" clauses, Guterl was in default on its postpetition agreements. Additionally, it possessed work in process with a finished value of $1 million, and required an additional $275,000.00 to complete same. Because Guterl was already in default, Equibank had exercised its right to cease making advances and/or loans. Guterl was also in jeopardy of losing its work force because it was delinquent in its

5. The security agreement and financing statements were executed in 1982. Pennsylvania did not officially adopt the 1972 Amendments to the Uniform Commercial Code until May 25, 1983. The Comments to the new section, 13 Pa.C.S.A. § 9402, are substantially similar.

health care payments. Guterl needed $275,000.00 to complete its work and $320,000.00 to maintain a work force to complete same. While a portion of this debt could be satisfied through other sources, Equibank did agree to loan Guterl additional sums of money. It would not be logical for Equibank, then owed $5.2 million by Guterl, to give additional hundreds of thousands of dollars without additional collateral.

The May 16, 1983 Order, signed by counsel for Equibank and Guterl states:

The automatic stay is lifted as to all collateral subject to ECFC's security interest under the August 24 Order, Accounts Receivable Agreement and Inventory Loan Agreement *including but not limited to all of Guterl's Accounts, contract rights, general intangibles, inventory including raw materials, work in process and finished goods* ... (emphasis added).

While it was clear in the security agreements that contract rights and choses in action described certain types of accounts receivable, such is not the case in this Supplemental Order. In fact, the Order specifically states that raw materials, work in process and finished goods are *included* in the collateral type called inventory, but it does *not* state that contract rights and general intangibles are included in the collateral type called accounts.

Merely granting Equibank relief from stay on the collateral it already possessed was not sufficient quid pro quo for the additional loan of over $450,000.00. The language of the Court Order is clear and counsel for both Equibank and Guterl signed same. We therefore find that as of May 16, 1983, Equibank obtained a security interest in Guterl's general intangibles. Said security interest was immediately perfected pursuant to the terms of the Order, as well as the fact that appropriate financing statements had been previously filed with the necessary state and local authorities. Having so held, we find that Equibank is secured in the pension plan overpayment/refund.

An appropriate Order will be issued.

ORDER OF COURT

AND NOW at Pittsburgh in said District this 11th day of October, 1988, in accordance with the foregoing Memorandum Opinion of this same date, it is ORDERED, ADJUDGED and DECREED that Equibank's Motion to Modify Stay and For Supplemental Relief be and is hereby GRANTED.

The Clerk of the U.S. Bankruptcy Court for the Western District of Pennsylvania is hereby directed to pay to Equibank the sum of $73,140.61 plus interest from March 17, 1987 accruing at six percent (6%) per annum.